Aaron M. Wais (State Bar No. 250671)
aaron.wais@lathropgpm.com
LATHROP GPM LLP
2049 Century Park East Suite 3500S
Los Angeles, CA 90067
Tel: (310) 789-4600 Fax: (310) 789-4601

R. Cameron Garrison (admitted *pro hac vice*)
cameron.garrison@lathropgpm.com
Travis W. McCallon (admitted *pro hac vice*)
travis.mccallon@lathropgpm.com
Luke M. Meriwether (admitted *pro hac vice*)
luke.meriwether@lathropgpm.com
Eric D. Sidler (admitted *pro hac vice*)
eric.sidler@lathropgpm.com
Timothy J. Hadachek (admitted *pro hac vice*)
timothy.hadachek@lathropgpm.com
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108
Tel: (816) 292-2000 Fax: (816) 292-2001

Attorneys for Defendant MUNCHKIN, INC.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDGEWELL PERSONAL CARE BRAND, LLC, INTERNATIONAL REFILLS COMPANY, LTD., and ANGELCARE USA, LLC,<br><br>       Plaintiffs,<br><br>vs.<br><br>MUNCHKIN, INC.<br><br>       Defendant. | Case No. 2:18-cv-03005-PSG-JPR<br>Hon. Philip S. Gutierrez<br><br>**MUNCHKIN, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

1

2  MUNCHKIN, INC.
                     Counter-Plaintiff,
3
       vs.
4
   EDGEWELL PERSONAL CARE
5  BRANDS, LLC, INTERNATIONAL
   REFILLS COMPANY, LTD., and
6  ANGELCARE USA, LLC
                     Counter-Defendants.
7

8

Motion Hearing: July 1, 2022, 1:30 p.m.
 Hon. Philip S. Gutierrez
Action filed: January 21, 2016
Pretrial Conf.: September 9, 2022 Trial
Date: September 22, 2022

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2
**Page**

3

I.     INTRODUCTION ..................................................................................... 1

4

II.    BACKGROUND ....................................................................................... 2

5

III.   LEGAL STANDARDS ............................................................................ 4

6

IV.  THE '420 PATENT IS INDEFINITE VIA THE TERM
"CLEARANCE." .................................................................................... 5

7

      A.    The Federal Circuit's ruling dictates that the term "clearance" is
indefinite. ...................................................................................... 5

8

9

           1.    Plaintiffs changed their position on appeal .................................... 5

10

           2.    The Federal Circuit's ruling cannot be reconciled with this
Court's construction of "clearance"—and Plaintiffs are
bound to the inconsistency .............................................................. 8

11

12

      B.    Plaintiffs' position is ambiguous even apart from their changing
positions. ...................................................................................... 11

13

14

V.    MUNCHKIN'S ACCUSED CASSETTES DO NOT INFRINGE. ................... 14

15

      A.    The Accused Cassettes do not infringe the '029 Patent. ..................... 14

16

           1.    No "outer edge" engaging an "upper part" of the cassette. ............ 14

17

           2.    No "inclined annular area defining a funnel." ................................ 16

           3.    No proper hypothetical claim for ensnarement. ............................. 19

18

      B.    The Fourth Generation Cassette does not infringe the '420 Patent. .. ...... 21

19

VI.  PLAINTIFFS ARE NOT ENTITLED TO LOST PROFITS ......................... 24

20

      A.    Edgewell cannot rely on an "inexorable flow" theory. ....................... 24

21

      B.    Angelcare USA is not entitled to lost profits before July 1, 2021. ..... ...... 29

22

      C.    Plaintiffs are not entitled to lost profits due to the existence of non-
infringing alternatives. .................................................................... 30

23

24

VII. CONCLUSION ...................................................................................... 30

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Page(s)**

4

**Cases**

5
6

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012) ................................................................. 4

7
8

*Finjan, Inc. v. ESET, LLC*,
   3:17-CV-0183-CAB-BGS, 2021 WL 2012248 (S.D. Cal. May 19,
   2021) ...................................................................................................... 10

9
10

*Fluidigm Corp. v. IONpath, Inc.*,
   No. 19-cv-5639, 2021 WL 292033 (N.D. Cal. Jan. 28, 2021) ............... 20

11
12

*G. David Jang, M.D. v. Bos. Sci. Corp.*,
   872 F.3d 1275 (Fed. Cir. 2017) ....................................................... 19, 20

13
14

*Grain Processing Corp. v. Am. Maize-Prod. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999) ............................................................. 30

15
16

*Illinois Tool Works, Inc. v. Seattle Safety, LLC*,
   No. 2:07-cv-02061, 2010 WL 11523620 (W.D. Wash. Oct. 13, 2010) ................. 28

17
18

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
   902 F.3d 1372 (Fed. Cir. 2018) ............................................................. 13

19
20

*Lusa Lighting, Int'l, Inc. v. Am. Elex, Inc.*,
   SA-CV 07-674-DOC, 2008 WL 4350741, at *2 (C.D. Cal. Sept. 22,
   2008) ........................................................................................................ 4

21
22

*Mars, Inc. v. Coin Acceptors, Inc.*,
   527 F.3d 1359 (Fed. Cir. 2008) ................................................. 25, 26, 28

23
24

*Mars, Inc. v. Trurx LLC*,
   No. 6:13-cv-00526, 2016 WL 4061981 (E.D. Tex. Apr. 29, 2016) ................. 25, 26

25
26

*Mars, Inc. v. Trurx LLC*,
   No. 6:13-CV-526, 2016 WL 4034803 (E.D. Tex. Mar. 14, 2016) ......................... 26

27
28

*Nevro Corp. v. Boston Sci. Corp.*,
   16-CV-06830, 2018 WL 4676501 (N.D. Cal. July 24, 2018) ................. 12

ii

*NLB Corp. v. PSI Pressure Sys. LLC*,
   No. 18-cv-1090, 2019 WL 6039932 (S.D. Tex. Nov. 14, 2019) ...........................21

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ........................................................................30

*Phil-Insul Corp. v. Airlite Plastics Co.*,
   854 F.3d 1344 (Fed. Cir. 2017) .........................................................................9

*Poly-America, L.P. v. GSE Lining Technology, Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004) ...................................................................27, 28

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   875 F.3d 1369 (Fed. Cir. 2017) ......................................................................30

*Sitrick v. Dreamworks, LLC*,
   CV 03-4265-SVW(AJWX), 2006 WL 6116641 (C.D. Cal. July 20,
   2006) ..........................................................................................................10

*SpeedTrack, Inc. v. Amazon.com*,
   998 F.3d 1373 (Fed. Cir. 2021) ......................................................................11

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
   620 F.3d 1305 (Fed. Cir. 2010) ...........................................................25, 26, 27

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015) ........................................................................5

*Transclean Corp. v. Jiffy Lube Intern., Inc.*,
   474 F.3d 1298 (Fed. Cir. 2007) ......................................................................10

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
   329 F. Supp. 3d 1070 (N.D. Cal. 2018), *aff'd*, 809 F. App'x 965 (Fed.
   Cir. 2020) ..................................................................................................26

*In re Walter*,
   698 Fed. Appx. 1022 (Fed. Cir. 2017) ............................................................13

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
   778 F.3d 1365 (Fed. Cir. 2015), *vacated on other grounds sub nom.*
   *Medtronic Sofamor Danek USA, Inc. v. NuVasive, Inc.*, 136 S. Ct. 893
   (2016)....................................................................................................26, 27

iii

1

**Statutes**

35 U.S.C. § 112................................................................................................ 5

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................... 4

Fed. R. Evid. 702 ........................................................................................... 29

iv

## I.    __INTRODUCTION__

Plaintiffs assert two patents directed to aspects of refill cassettes used in waste receptacles, such as diaper pails: U.S. Patent Nos. 6,974,029 and 8,899,420. This Court previously granted Munchkin's motion for summary judgment of non-infringement as to both patents. On appeal, the Federal Circuit vacated the Court's holding regarding the '420 Patent and reversed its holding regarding the '029 Patent. But *numerous* fatal flaws in Plaintiffs' case remain, and this case is once again ripe for summary judgment.

Regarding the '420 Patent, Munchkin has always maintained that this Court's prior summary judgment order reflected the only possible interpretation of the "clearance," and that any deviation from that interpretation would render the term inconsistent and indefinite. The Federal Circuit's ruling therefore dictates that the term is now indefinite, rendering the claims invalid. This is further borne out by the fact that Plaintiffs, after losing on summary judgment, coyly gamed the issues on appeal and presented a position that was directly contrary to the position they presented to this Court. Now, after convincing the Federal Circuit to adopt their changed position, Plaintiffs have reverted back to their prior position again. Yet, after all of that, Plaintiffs' position *still* deviates from both this Court's claim construction (which still stands) and the Federal Circuit's ruling and depends upon multiple layers of unpredictable subjectivity. In short, there is no possible way to make sense of the "clearance," and the bill on Plaintiffs' ever-evolving manipulation of the patent must finally come due.

Even if the '420 Patent is not indefinite, Munchkin's current Fourth Generation Cassette does not infringe due to the absence of any inflection point in the annular wall, making it impossible for any "clearance" (even if ascertainable) to be located "radially outward of a downward projection of the annular wall," as claimed. Summary judgment is separately warranted on this basis.

Regarding the '029 Patent, while the Federal Circuit held that there is an issue of fact regarding whether Munchkin's "two-part" cover is equivalent to the claimed

1

---

singular "annular cover," the differences between the Accused Cassettes and the claimed cover manifest in numerous other limitations, as well. In particular, because the packaging on Munchkin's Accused Cassettes is not designed as a "tear-off" feature as claimed, the "outer edge" of such packaging does not engage the "upper part" of the cassette. In addition, the cover on the Accused Cassettes does not contain "an inclined annular area defining a funnel," but is uneven and indisputably non-funnel-like. In addition, Munchkin has asserted the doctrine of ensnarement in response to Plaintiffs' doctrine of equivalents theory regarding the claimed "annular cover." But Plaintiffs have failed to articulate a hypothetical claim that broadens the scope of the claim and literally covers the Accused Cassettes, as is their burden. For any of these reasons, summary judgment as to the '029 Patent is appropriate.

Finally, Plaintiff Edgewell does not sell any of the products that form the basis of its lost profits damages claim in this case. Rather, those sales are made by a subsidiary entity. Federal Circuit law precludes any right to profits in such circumstances, and Edgewell cannot prove any flow of profits to itself, in any event. Likewise, Plaintiff Angelcare USA did not sell any of the products that form the basis of its lost profits claim or have the manufacturing capacity to claim lost profits until July 1, 2021. And none of the Plaintiffs are entitled to lost profits if Munchkin's Fourth Generation Cassette does not infringe, because such cassette would necessarily be an acceptable non-infringing alternative precluding a profits award. Summary judgment is appropriate on these issues, as well, if the patents are otherwise valid and not infringed.

## II.   **BACKGROUND**

The primary focus of the '420 Patent is a claimed "clearance" in the bottom portion of the cassette. (*See* SUF ¶¶1-2.)[1] The Court previously construed the

---

[1] All citations to Munchkin's Rule 56.1 Statement of Uncontroverted Facts and Contentions of Law, filed contemporaneously herewith, are referred to as "SUF" with the appropriate reference to each undisputed fact.

2

"clearance" to mean "a space within the annular receptacle that is configured to prevent interference between the annular wall and another structure." (SUF ¶ 5.) The Court previously granted summary judgment of non-infringement to Munchkin, because all of the Munchkin Accused Cassettes contact—and thus interfere with—the "interfering member" in Plaintiffs' (and Munchkin's) diaper pails. (SUF ¶¶ 48, 50-52.) As the Court stated, the disclosures of the patent "do[] not support interpreting the term 'clearance' as including points where there is not actually space between the wall and another structure." (SUF ¶ 52.) Although this Court later explained that its "claim construction order was itself clear" and that "[n]othing in the summary judgment order departed from th[e] analysis" in the claim construction order (SUF ¶ 54), Plaintiffs did not challenge the Court's construction of "clearance" on appeal but rather alleged that the Court had "revised" or "re-interpreted" its construction at summary judgment. (SUF ¶¶ 55, 57.) The Federal Circuit ultimately adopted Plaintiffs' argument, without addressing or disturbing the language of this Court's construction of "clearance," and vacated and remanded the summary judgment order regarding the '420 Patent. (SUF ¶¶ 60, 64.)

The focus of the '029 Patent is the claimed "cover" of the cassette, and specifically the configuration of a "tear-off" section of the cover. (*See* SUF ¶¶ 10, 13-15.) The Court construed "annular cover" to mean "a single, ring-shaped cover including at least a top portion and an inner portion that are parts of the same structure" and construed "a tear-off outwardly projecting section" to mean "a section initially formed as part of the same structure as the rest of the annular cover, which can be torn off from the rest of the annular cover." (SUF ¶¶ 17, 19.) The Court granted summary judgment of non-infringement to Munchkin, finding that because the Accused Cassettes contain a "two-part" cover, extending the patent to cover them would ignore the claim construction and vitiate the claims' limitations. (SUF ¶ 99.) On appeal, the Federal Circuit affirmed the Court's construction of the relevant terms from the '029 Patent but

found there to be a triable issue of fact on the equivalents issue, and thus reversed and remanded the summary judgment order regarding the '029 Patent. (SUF ¶ 100.)

Munchkin has sold four relevant "generations" of refill cassettes: a First Generation, a Second Generation, a Third Generation, and a Fourth Generation (the only cassette currently sold). (SUF ¶ 23) Plaintiffs accuse the Second, Third, and Fourth Generation Cassettes of infringing the '029 and '420 Patents (the "Accused Cassettes"). (SUF ¶¶ 29-30.) Plaintiffs do not accuse the First Generation Cassette of infringing either patent. (SUF ¶ 29-30.) The Accused Cassettes are marketed as being compatible with both Munchkin branded diaper pails and Plaintiffs' Diaper Genie branded diaper pails.  (SUF ¶ 23.)

The Second and Third Generation Cassettes share the same structure in their cassette bodies and covers. (SUF ¶¶ 23-25.) The Second Generation Cassette is packaged with shrinkwrap, while the Third Generation is packaged with a "blister cap." (SUF ¶¶ 23-25.) The Fourth Generation Cassette embodies significantly different geometry in the body of the cassette, as the inner annular wall has no bend, or inflection point. (SUF ¶¶ 23, 133-34.) The Fourth Generation Cassette's cover is the same as that in the Second and Third Generation Cassettes, and the Fourth Generation is packaged with the same blister cap as the Third Generation Cassette. (SUF ¶¶ 23-25.)

## III.   **LEGAL STANDARDS**

Summary judgment resolves any claim if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In a patent case, "an infringement analysis is amenable to summary judgment" in the absence of disputed facts.  *Lusa Lighting, Int'l, Inc. v. Am. Elex, Inc.*, SA-CV 07-674-DOC, 2008 WL 4350741, at *2 (C.D. Cal. Sept. 22, 2008).  Likewise, "indefiniteness is a question of law," and therefore also amenable to summary judgment. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

4

## IV.   THE '420 PATENT IS INDEFINITE VIA THE TERM "CLEARANCE."

As noted above, Munchkin has long claimed that there is no coherent meaning or application of the term "clearance" other than that applied by the Court at the prior summary judgment stage. (SUF ¶ 49.) Given the Federal Circuit's ruling vacating the Court's summary judgment order, the only conclusion left is that the term is indefinite under 35 U.S.C. § 112 for "fail[ing] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1340–41 (Fed. Cir. 2015).

That Plaintiffs had to manipulate the issues and fundamentally change their position on appeal, only to change positions back again before this Court, confirms that there is now no possible way to ascertain a consistent, logical meaning for the "clearance." Indeed, the parties and Court are left with a Federal Circuit ruling that cannot be reconciled with this Court's claim construction and multiple positions from Plaintiffs that are inconsistent with each other and nonsensical in their own right.

### A.   The Federal Circuit's ruling dictates that the term "clearance" is indefinite.

The only path for Plaintiffs to prevail on appeal was to sidestep this Court's original construction of "clearance" and fundamentally change their position. Unfortunately, this led to a ruling from the Federal Circuit that makes no sense in light of the Court's original construction or the positions Plaintiffs assert before this Court— neither of which Plaintiffs put at issue on appeal. Plaintiffs are now bound to the unresolvable mess they have made of the '420 Patent.

#### 1.   Plaintiffs changed their position on appeal.

Plaintiffs have been scrambling from the beginning to find a way to make the Court's construction of the claimed "clearance" read on both the patent's Figure 7 embodiment and Munchkin's Accused Cassettes. The challenge for Plaintiffs has always been that the Court's construction requires a space "configured to prevent

5

interference between the annular wall [of the cassette] and another structure." That limitation is difficult to square with Figure 7 or the Accused Cassettes, all of which involve contact between the cassettes' annular walls and other structures, as this Court's prior summary judgment order recognized. (SUF ¶¶ 48, 50-52.)

Thus, after the Court rejected Plaintiffs' position at summary judgment, one would have thought that Plaintiffs would challenge the construction of "clearance," and particularly the "configured to prevent interference" limitation that was the crux of the Court's summary judgment order. But Plaintiffs did not challenge that construction, and in fact stated on appeal that "[t]he district court's original construction was correct." (SUF ¶ 55.) Instead, Plaintiffs argued that the Court at summary judgment "added a new requirement that the unclaimed *pail* (and specifically the pail's interfering member) may not 'take[] up,' 'fill,' or 'replace[]' the clearance 'space' of the cassette." (SUF ¶ 56 (emphasis in original).) Plaintiffs labeled this a "re-interpretation" and a "revised construction"—this Court's own explanation to the contrary notwithstanding—and focused their appeal there, arguing that it improperly excluded the embodiment of Figure 7 (among others). (SUF ¶ 57.) But, because Plaintiffs never put the Court's original construction at issue, they never addressed whether the language of that construction could even conceivably extend to an embodiment, like Figure 7, where the annular wall of the cassette contacts another structure. In other words, Plaintiffs asked the Federal Circuit to hold that the original construction must extend to all embodiments as a matter of principle, without regard to its actual language.

Yet, even this obfuscation was mere backdrop to Plaintiffs' more brazen turnabout on appeal. Before this Court, Plaintiffs unequivocally took the position that a cassette's interaction with a diaper pail is critical to assessing whether a "clearance" exists. Thus, Plaintiffs' expert opined that ███████████████████████ ██████████████████████████████████████████████████ ████████████████████ (SUF ¶ 66 (emphasis added); *see also* SUF ¶ 72.) On appeal,

6

1   however, Plaintiffs took the opposite position—*i.e.*, that a cassette's interaction with a

2   diaper pail is irrelevant. Indeed, Plaintiffs' guiding assertion on appeal was that this

3   "[C]ourt <u>erred by relying on how the cassette functions when it is inserted into a pail</u>."

4   (SUF ¶ 58.) Likewise, counsel for Plaintiffs explicitly asserted at oral argument that

5   "the clearance can be discerned simply by looking at the cassette." (SUF ¶ 59.)

6        The Federal Circuit adopted Plaintiffs' changed position on appeal, while leaving

7   this Court's original construction untouched, holding that "the term 'clearance' should

8   be construed as covering <u>all uses</u> of the claimed cassette" and that "the district court

9   erred in construing the term 'clearance' on summary judgment <u>in a manner dependent</u>

10  <u>on the way the claimed cassette is put to use in an unclaimed structure</u>." (SUF ¶¶ 61-62

11  (emphases added).) As the Federal Circuit concluded, "[t]he clearance limitation is

12  satisfied when the cassette itself is constructed with a clearance." (SUF ¶ 63.) Just as

13  Plaintiffs desired, the Federal Circuit did not reconcile its holding with the Court's

14  original claim construction or any of Plaintiffs' prior arguments. (SUF ¶ 64.)

15       Now, after having prevailed before the Federal Circuit and despite the arguments

16  it made to prevail there, Plaintiffs are reverting back to their prior position—i.e., that a

17  cassette's interaction with a diaper pail is critical to assessing whether a "clearance"

18  exists according to this Court's construction. As Mr. Jobin stated in his 2022 expert

19  report, ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████ (SUF ¶ 65 (emphasis added).) And at

22  his recent deposition Mr. Jobin did not hesitate to again contradict Plaintiffs' appellate

23  argument, stating that ████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████ (SUF ¶¶ 67-68 71.)

26       The bottom line is this: Plaintiffs told (and are telling) this Court one thing, and

27  they told the Federal Circuit another thing entirely. This creates numerous issues,

28                                                    7

including that it is now impossible to reconcile the Federal Circuit's ruling with this Court's construction and, regardless of the construction, it is now impossible to make any sense of Plaintiffs' position, the Federal Circuit ruling, or the '420 Patent at all.

### 2. The Federal Circuit's ruling cannot be reconciled with this Court's construction of "clearance"—and Plaintiffs are bound to the inconsistency.

The Federal Circuit's ruling that "the term 'clearance' should be construed as covering all uses of the claimed cassette" and may not be "dependent on the way the claimed cassette is put to use in an unclaimed structure" (SUF ¶¶ 61-62) cannot be reconciled with the express language of this Court's construction of "clearance," which requires a space "configured to prevent interference between the annular wall [of the cassette] and another structure" (SUF ¶ 5). Because the "clearance" must be "configured to prevent interference between the annular wall and another structure" it is necessarily "dependent on the way the claimed cassette is put to use in an unclaimed structure." Indeed, both parties have always agreed that the "another structure" is a diaper pail. (SUF ¶¶ 6-8.) And Plaintiffs' expert to this day believes that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (SUF ¶ 68.)

The express conflict between the Federal Circuit's ruling and this Court's construction also leads to conceptual inconsistencies. Under the Federal Circuit's ruling, "[t]he claim does not require a clearance after insertion." (SUF ¶ 63.) In other words, the "space within the annular receptacle that is configured to prevent interference between the annular wall and another structure" may exist or not exist after insertion into a pail. But if that is true, it negates the "configured to prevent interference" limitation altogether. A space cannot be "configured to prevent interference between the annular wall and another structure" if it does not matter whether such space actually "prevent[s] interference between the annular wall and another structure" in use. By the same token, it is impossible to determine if a "cassette itself is constructed with a clearance," as the Federal Circuit put it, apart from insertion into a pail. The only way

8

1    to know whether a cassette has "a space configured to prevent interference between the

2    annular wall and another structure" is to insert it into a receptacle and assess whether

3    there is, in fact, "interference between the annular wall and another structure." (*See* SUF

4    ¶ 70.) This, of course, is why Plaintiffs still maintain that ████████████████████

5    ████████████████████████████ notwithstanding the Federal Circuit's ruling and

6    their own arguments on appeal. (SUF ¶ 68.)

7         The irreconcilability of the Federal Circuit's ruling and this Court's construction

8    of "clearance" is a direct result of Plaintiffs' duplicity and reflects the fact that, apart

9    from the view adopted by the Court in its prior summary judgment order, there is no

10   possible way to interpret the term with reasonable certainty. And it is not simply that

11   the Federal Circuit's ruling and the Court's original construction cannot exist together

12   (though they cannot). It is that Plaintiffs had to resort to an inconsistent position in order

13   to overturn this Court's prior summary judgment order—and then reverse course a

14   second time when once again faced with the actual language of the Court's construction.

15   How can the "clearance" limitation be susceptible to reasonable interpretation at this

16   point when Plaintiffs themselves cannot reasonably or consistently interpret the term?

17        Just as important, Plaintiffs are bound to the inconsistency they have woven.

18   Plaintiffs on appeal unequivocally took the position that this Court's construction "was

19   correct" (SUF ¶ 55), while also setting forth arguments that were fundamentally

20   inconsistent with that construction and their own prior positions. By choosing not to

21   appeal this Court's original construction of "clearance," despite that the construction

22   was ripe for appeal, Plaintiffs have waived any argument that the original construction

23   is erroneous. *See Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1357 (Fed. Cir.

24   2017) (internal quotation omitted) ("An issue that falls within the scope of the judgment

25   appealed from but is not raised by the appellant in its opening brief on appeal is

26   necessarily waived."). At the same time, however, Plaintiffs are also wed to the

27   arguments they made on appeal that were contrary to the original construction and

28

9

accepted by the Federal Circuit, through the doctrine of judicial estoppel, which "prohibits a party from taking inconsistent positions in the same or related litigation." *Transclean Corp. v. Jiffy Lube Intern., Inc.*, 474 F.3d 1298, 1307 (Fed. Cir. 2007).

Three factors guide the application of judicial estoppel: (1) a party's later position must be "clearly inconsistent" with an earlier position; (2) the party must have succeeded in persuading a court to adopt the earlier position; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Transclean*, 474 F.3d at 1307. All three factors are present here. As noted above, Plaintiffs' appeal position that "<u>the clearance can be discerned simply by looking at the cassette</u>" without regard to use in a receptacle (SUF ¶ 59) is directly contrary to their position before this Court that ███████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ (SUF ¶¶ 67-68). And the Federal Circuit adopted Plaintiffs' appeal position, holding that "the district court erred in construing the term 'clearance' on summary judgment in a manner dependent on the way the claimed cassette is put to use in an unclaimed structure." (SUF ¶ 62.) Plaintiffs' change in position clearly benefits Plaintiffs and prejudices Munchkin by allowing Plaintiffs to treat the '420 Patent like a nose of wax and avoid the consequences of its own inconsistent positions.

In short, Plaintiffs are stuck with the language of the Court's construction but are also estopped from deviating from their appeal position—which is inconsistent with the language of the Court's construction. And the inconsistency dictates that the patent is indefinite. Indeed, courts have held that the "internally inconsistent use" of a term in a patent supports a finding of indefiniteness. *Sitrick v. Dreamworks, LLC*, CV 03-4265-SVW(AJWX), 2006 WL 6116641, at *16 (C.D. Cal. July 20, 2006). The same is true regarding expert opinions and litigation arguments. In *Finjan, Inc. v. ESET, LLC*, 3:17-CV-0183-CAB-BGS, 2021 WL 2012248, at *1 (S.D. Cal. May 19, 2021), for example,

10

the court concluded that the patentee's "inconsistent interpretations of a claim term employed in its infringement analyses established that the term was indefinite." *See also SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1380 (Fed. Cir. 2021) (rejecting a patentee's claim interpretation in light of contradictory litigation statements). Plaintiffs' inconsistent positions throughout this case are no different.

## B.    Plaintiffs' position is ambiguous even apart from their changing positions.

Regardless of whether or how one might reconcile Plaintiffs' changing positions (or the Court's construction and the Federal Circuit's ruling), Plaintiffs' position strays from all standards governing the "clearance" and is ambiguous in its own right.

First, Plaintiffs' position deviates from this Court's construction. Mr. Jobin has stated that ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ (SUF ¶ 66; *see* SUF ¶ 71.) He has also explained that interference occurs ███████████ ███████████████████████████████████████████████████████ ███████████████████████████████ (SUF ¶ 73.) But the Court's construction makes no reference to the fit or function of a cassette, or to any other parts of the cassette other than the annular wall. (SUF ¶¶ 5, 78.)

Moreover, Plaintiffs' position decouples "interference" from the requirement that such interference occur "between the annular wall and another structure." Two cassettes with the same geometry in their bottom portions and the same interaction with another structure may have different "fit" or "function" outcomes due to unclaimed cassette features like height or width, the presence of additional or different features in their top portions, or varying lid (or other) configurations in pails. Indeed, Mr. Jobin has stated that ███████████████████████████████████████████████████████████ ███████████████████████████ and he further admitted that ██████████████ ███████████████████████████████████████████████████████████

11

1   ███████████████████████████████████████████████████████████

2   ███████████████████████████████████████████████████████ (SUF

3   ¶¶ 76, 75.) Thus, under Plaintiffs' view, the "clearance" space itself is not determinative

4   of or reliable for determining whether a "clearance" exists. Rather, Plaintiffs apply the

5   "clearance" limitation not as a parameter, but as a variable *effect* of "fit and/or

6   function"—i.e., if a cassette fits and functions, there is a "clearance." This is the epitome

7   of unpredictability and indefiniteness. *See Nevro Corp. v. Boston Sci. Corp.*, 16-CV-

8   06830, 2018 WL 4676501, *3 (N.D. Cal. July 24, 2018) (holding claims indefinite when

9   dependent on a variable effect rather than an objective parameter).

10          Plaintiffs' position also manages to be contrary to the Federal Circuit's ruling

11   that the term "clearance" should cover "all uses of the claimed cassette" and may not

12   be "dependent on the way the claimed cassette is put to use in an unclaimed structure."

13   (SUF ¶¶ 61-62.) Indeed, as noted, Plaintiffs and Mr. Jobin now again believe the

14   opposite—███████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████

16   ██████████████████████████████████████ (SUF ¶ 65.) How can anyone

17   know the meaning of "clearance" with any certainty when Plaintiffs themselves cannot

18   proffer a position that is consistent with *any* of the standards (this Court's or the Federal

19   Circuit's) that they claim should govern?

20          Beyond all of this, the very concepts of "fit" and "function" are also inherently

21   subjective and ambiguous. Mr. Jobin acknowledges the difficulty in assessing fit,

22   stating that ████████████████████████████████████████████████████

23   ████████ (SUF ¶ 88.) Not surprisingly, Mr. Jobin has identified only subjective measures

24   that find no support in the patent when attempting to describe how to assess fit or

25   function: ████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████

27   ████████████████ etc. (SUF ¶ 90.)  Even when pressed for quantifiable specificity about fit

28

12

and function, he ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████ (SUF ¶ 92.) Similarly, when asked whether there are

a "range of positions" a cassette can occupy and still "fit," he ███████████████████

████████████████████████████████████████████████████████████████████

(SUF ¶ 93.)

Mr. Jobin's application of the "fit and function" standard also highlights its

unpredictability. During his deposition, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████ (SUF ¶ 94.) If █████████████████████████████████

█████████████ it is difficult to understand how the cassette fits and functions under Plaintiffs'

own standard, or how the cassette otherwise satisfies the Court's construction of

"clearance" which requires the *prevention* of interference. Moreover, ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ (SUF ¶ 92

██████████████████████████████ Apparently, Plaintiffs and Mr. Jobin believe that

*some* interference or deflection is acceptable to still allow for "fit and function." But

how much? ████████████████████████████████ When is "fit

and function" a distinction between infringing and non-infringing products at all?

Neither the '420 Patent nor Plaintiffs provide any answer to these questions.

When the scope of a claim has "ill-defined boundaries" and the patentee puts the

claim language to "erratic use," the claim "fails to inform skilled artisans about the

scope of the invention with reasonable certainty." *In re Walter*, 698 Fed. Appx. 1022,

1027 (Fed. Cir. 2017). Likewise, a limitation that "is purely subjective and depends on

the unpredictable vagaries of any one person's opinion is indefinite." *Intellectual*

*Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (internal

13

quotation omitted). This is precisely the case with Plaintiffs' shifting view of the "clearance" limitation. For these reasons, it is indefinite and the '420 Patent is invalid.

## V.   MUNCHKIN'S ACCUSED CASSETTES DO NOT INFRINGE.

None of the Accused Cassettes infringe the '029 Patent, and Munchkin's Fourth Generation Cassette does not infringe the '420 Patent.

### A.   The Accused Cassettes do not infringe the '029 Patent.

Plaintiffs' effort to extend the '029 Patent to the very different cover configuration in the Accused Cassettes has multiple fatal flaws. Because the Accused Cassettes have no actual "tear-off outwardly projecting section," there is no "outer edge" of such a section engaging an "upper part" of the outer wall of the cassette. In addition, there is no "inclined annular area defining a funnel" in the cover of the Accused Cassettes. Finally, Plaintiffs have not drafted a proper (and required) hypothetical claim in response to Munchkin's reliance on the doctrine of ensnarement.

### 1.   No "outer edge" engaging an "upper part" of the cassette.

The claims of the '029 Patent all require the "tear-off outwardly projecting section" to have "an outer edge engaging an upper part of said outer wall of said annular body." (SUF ¶¶ 14, 101.) But neither the shrink-wrap packaging (on the Second Generation Cassette) nor the blister cap packaging (on the Third and Fourth Generation Cassettes) have "an outer edge" that is engaging "an upper part" of the outer wall as claimed. (SUF ¶ 110) Plaintiffs' own annotated images of the Accused Cassettes and numerous admissions made by their technical expert, Mr. Jobin, demonstrate these facts. (SUF ¶¶ 102-104.)

14

As shown from Plaintiffs' annotated images above, even if the shrink-wrap and blister cap packaging components could be said to be "engaging" the outer wall of the cassettes (they are not),[2] the "outer edge" of the shrink-wrap on the Second Generation is not engaging "an upper part" of the outer wall. In fact, the "outer edge" of the shrink-wrap is not remotely close to the "upper part" of the outer wall and, instead, extends to nearly the *bottom* of the wall. (SUF ¶¶ 102-104.) The blister cap on the Third and Fourth Generation Cassettes does not have an "outer edge" that engages an "upper part" of the outer wall, either. Instead, the "outer edge" of the blister cap is located approximately one-quarter of the way down the outer wall. And the portion of the blister cap that is located at the "upper part" of the outer wall is nowhere near the "outer edge" of the blister cap. (SUF ¶¶ 102-104.)

When asked whether the shrink-wrap on the Second Generation Cassette has an "outer edge" engaging the upper part of the outer wall, Mr. Jobin

---

[2] Plaintiffs have previously attempted to confuse the issues on this limitation by focusing on a different limitation (i.e., "engaging"). *See* Dkt. 327 at 8-9. While Munchkin disagrees that the shrink-wrap or blister cap are "engaging" the outer wall of the cassette (as also depicted in Plaintiffs' annotated images above), that limitation is not at issue here.

15

1   ████████████████████████████████████████████████████████

2   (SUF ¶ 105.) Regarding the blister cap, he similarly stated that ████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████   (SUF ¶ 107.) Thus, rather than engage at the edge, the

5   cap engages merely ████████████   (SUF ¶ 107.) In further explaining how the blister

6   cap engages the outer annular wall, Mr. Jobin explained that ████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████   (SUF ¶¶ 108-109.)

10        Thus, it is undisputed that there is no engagement of the "outer edge" of the

11   shrink-wrap or the blister cap at "an upper part" of the outer wall. (SUF ¶ 110.) Plaintiffs

12   have not set forth any doctrine of equivalents positions with respect to this "outer edge"

13   limitation, either. (SUF ¶ 111.) As such, Munchkin is entitled to summary judgment of

14   non-infringement as to the '029 Patent.

15        **2.    No "inclined annular area defining a funnel."**

16        All claims of the '029 Patent also require that the "annular cover" have a

17   "downwardly projecting inner portion having an inclined annular area defining a funnel

18   to assist in sliding said tubing when pulled through the central core." (SUF ¶ 112.) As

19   shown in Figure 2 below, the '029 Patent describes this "inclined annular area defining

20   a funnel" as being "formed of a flat area 27a and a funnel shaped inner area 27b," which

21   allows the tubing to slide "along the annular smooth edge 54 of the cover over the flat

22   area 27a and along the funnel area 27b" into the central core of the cassette. (SUF ¶¶

23   113-115.) As Munchkin's expert, Glenn May, opined, these funnel shaped areas in the

24   patent are depicted as "smooth, uniform, and sloping annular areas that are properly

25   characterized as funnels" or at least funnel-like. (SUF ¶ 118.)

26

27

28

16

| **'029 Patent FIG. 2** |
| :---: |



The cover structure on the Accused Cassettes is nothing like the inclined area and funnel depicted and described in the '029 Patent.[3] The accused cover is not uniform in shape, nor is it smooth, but instead incorporates various alternating features and adornments. For example, as Mr. May noted and as depicted below, the outermost edge of the cover consists of a prominent raised lip, while the innermost portion consists of a series of stepped portions where the cover engages the inner wall of the cassette. (SUF ¶ 120.) The top part of the cover incorporates a series of alternating holes, raised areas, and flat areas around the circumference of the cover. (SUF ¶ 120.) The flat areas and holes have no downward projection, nor are they inclined or funnel-like, as is apparent from Plaintiffs' own cross-section image of an Accused Cassette showing the flat area, also below. (SUF ¶¶ 119-121.)

---

[3] All of the Accused Cassettes (Second, Third, and Fourth Generation) have the same molded plastic cover. (SUF ¶¶ 23-25.)

17



**Mr. May's Annotated (Fourth Generation Cassette)**

Notably, as described above, the '029 Patent itself distinguishes between "a flat area" and "a funnel shaped . . . area," making clear that a "flat" area is not a "funnel." Necessarily, then, the flat areas around the circumference of the cover of the Accused Cassettes prevent the cover from having an "inclined annular area defining a funnel."

Plaintiffs' expert, Mr. Jobin, had no choice but to acknowledge these clear facts. When asked about the various permutations on the cover, he acknowledged that ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ (SUF ¶¶ 123-125). According to Mr. Jobin, these ████████████████████████████████████████████

█████████████████████████████████████████. (SUF ¶¶ 123-124.) Thus, however one might describe the shape of the cover on the Accused Cassettes, if that shape is ██████████████ then the cover by definition cannot contain an "inclined *annular* area defining a funnel," as claimed. (SUF ¶ 128)

In addition, as further proof that the Accused Cassettes contain no "funnel," the uneven structure of the cover is not such that it can be said to "assist in sliding said

18

1   tubing when pulled through a central core," as the patent further recites and as Mr. May

2   opines. (SUF ¶ 127.) Here again, Mr. Jobin agrees that the cover on the Accused

3   Cassettes has ████████████████████████████████████████ (SUF ¶

4   122.) And in his expert report he explains that ████████████████████████

5   ████████████████████████████ (SUF ¶ 126.) This is precisely the opposite of

6   the "funnel" described and claimed in the patent.

7        Because there is no dispute that the non-funnel permutations incorporated in the

8   cover of the Accused Cassettes—████████████████████████████████████

9   ████████████████████, there can be no "inclined annular area," and certainly

10  no such area "defining a funnel" as required by the '029 Patent. And, once again, neither

11  Plaintiffs nor Mr. Jobin have provided any doctrine of equivalents positions with respect

12  to this limitation. (SUF ¶ 129.) Thus, Munchkin is entitled to summary judgment of

13  non-infringement on the '029 Patent for this independent reason, as well.

14            **3.    No proper hypothetical claim for ensnarement.**

15       Plaintiffs allege that the Accused Cassettes infringe the '029 Patent's "annular

16  cover" and "tear-off outwardly projecting section" limitations under the doctrine of

17  equivalents. (SUF ¶¶ 32-33.) In response to Plaintiffs' doctrine of equivalents

18  allegation, Munchkin has asserted the ensnarement defense, which is a well-recognized

19  limitation on the doctrine of equivalents. (SUF ¶ 130.) Under this defense, a doctrine of

20  equivalents theory "cannot be asserted if it will encompass or 'ensnare' the prior art."

21  *G. David Jang, M.D. v. Bos. Sci. Corp.*, 872 F.3d 1275, 1285 (Fed. Cir. 2017).

22  Munchkin contends that the "annular cover" and "tear-off outwardly projecting section"

23  that Plaintiffs contend are present in the Accused Cassettes under the doctrine of

24  equivalents—namely a partial cover and packaging components—are also present in

25  the prior art, and that Plaintiffs' equivalents theory ensnares the prior art. (SUF ¶ 130.)

26       Having been put on notice of Munchkin's ensnarement defense, Plaintiffs have

27  the "burden of proving that [their] doctrine of equivalents theory [does] not ensnare the

28                                          19

prior art." *Jang*, 872 F.3d at 1287. The ensnarement analysis "begins with the patent owner's articulation of a 'hypothetical claim that literally covers the accused device.'" *Fluidigm Corp. v. IONpath, Inc.*, No. 19-cv-5639, 2021 WL 292033, at *8 (N.D. Cal. Jan. 28, 2021) (quoting *Jang*, 872 F.3d at 1285). To meet its burden of proof in response to an ensnarement defense, a patent owner must articulate a "proper hypothetical claim" that is "broad enough to literally cover [the accused product], yet not so broad that it would be unpatentable over the prior art." *Jang*, 872 F.3d at 1282. Where a patent owner fails to identify a hypothetical claim that is broader in scope than the original claim and literally covers the accused product, it fails to meet its burden of proof and judgment of non-infringement is warranted. *See id.* at 1287 (affirming judgment of non-infringement under doctrine of equivalents due to patent owner's "fail[ure] to submit a proper hypothetical claim"). Critically, "the district court [is] under no obligation to undertake a hypothetical claim analysis on [the patent owner's] behalf." *Id.*

Here, Plaintiffs have drafted a hypothetical claim that is no broader than original Claim 1 of the '029 Patent. Plaintiffs' hypothetical claim is *identical* to Claim 1 except for the addition of ███████████████████████████████████████ ███████ (SUF ¶¶ 131-132.) But the added phrase ███████████████████████ is superfluous to, and no different than, the original claim's various descriptions of a cover having ████████████████████." (SUF ¶¶ 13-14, 132.) It is also no different than the Court's construction of the "annular cover" limitation, which, like the remainder of the claim, ███████████████████████████." (SUF ¶¶ 17, 19.) Because Plaintiffs' hypothetical claim is no broader than original Claim 1, and (like original Claim 1) does not literally cover the Accused Cassettes, Plaintiffs have failed to meet their burden of proof. Summary judgment of non-infringement of the '029 Patent is warranted for this independent reason, as well. This is precisely what occurred in *Jang*, and the same result is required here. 872 F.3d at 1287; *see also Fluidigm*, 2021 WL 292033, at *8 (summary judgment of non-infringement based on patent owner's

20

failure to "articulate an adequate hypothetical claim"); *NLB Corp. v. PSI Pressure Sys. LLC*, No. 18-cv-1090, 2019 WL 6039932, at *3–5 (S.D. Tex. Nov. 14, 2019) (same).

## B.     The Fourth Generation Cassette does not infringe the '420 Patent.

Even if the '420 Patent is somehow not indefinite, there can be no dispute that Munchkin's Fourth Generation Cassette does not infringe. As Mr. Jobin admits, the Fourth Generation Cassette is different from all other generations in that it lacks ███ ███████████████████████████████████████████████████████████ ████████████████████████ (SUF ¶ 133.) This is apparent from a comparison between Munchkin's Second Generation Cassette (highlighted) and the Fourth Generation Cassette (bold black), below. (SUF ¶ 134.)



The absence of this inflection point has critical ramifications given the language of the claims of the '420 Patent, and Plaintiffs again must resort to mental gymnastics and a distortion of the patent as the basis for their position.

Independent claims 1 and 6 (Plaintiffs do not assert independent claim 11 against the Fourth Generation Cassette) both recite that the "clearance"—whatever it means—must be "located radially outward of a downward projection of the annular wall." (SUF ¶¶ 135, 137.) The "downward projection of the annular wall," on its face, is simply an imaginary downward line *continuing in the plane of the annular wall*. (*See* SUF ¶ 139.) In the context of, for example, Mr. Jobin's analysis of Munchkin's Third Generation Cassette, a downward continuation of the annular wall places the "clearance" (as Mr.

21

Jobin views it) such that it is radially outward of that downward continuation. (SUF ¶¶ 138-139.) But because the Fourth Generation Cassette lacks an "inflection point," there can be no "downward projection of the annular wall" within the receptacle that is separate from the annular wall itself. If there is to be a downward projection of the annular wall, it necessarily extends below receptacle, which results in the "clearance" as identified by Mr. Jobin being *above and radially inward* of this projection. (SUF ¶ 139.) Mr. Jobin's incongruous position is juxtaposed against Mr. May's annotations below (assuming Mr. Jobin's "clearance" locations).

Mr. Jobin recognizes the incongruity of his position, acknowledging that

(SUF ¶ 140.) During his deposition, he explained that he was able to reach this conclusion by using an

(SUF ¶ 141.) But this is not a "downward projection *of the annular wall*." In addition, and again due to the lack of any inflection point, this requires Mr. Jobin to arbitrarily select an endpoint for the annular wall that is located within the middle of the wall itself, as Mr. Jobin's annotation

22

(in yellow) above depicts. There is no support in the patent for this position, and it is contrary to the entire thrust of the invention.

Perhaps recognizing the weakness in their infringement position, Plaintiffs also allege that the four vents or notches in the Fourth Generation Cassette are "clearances," though Mr. Jobin contends that these notches are only "clearances" when used in a Munchkin diaper pail containing prongs that interact with these notches to lock the cassette in place. (SUF ¶ 141.) But here, Plaintiffs run up against the limitation in claim 1 reciting "the clearance delimiting a portion of the volume having a reduced width relative to a portion of the volume above the clearance" and the similar limitation in claim 6 reciting "said clearance delimiting a reduced width of said portion of the volume relative to the volume above the clearance." (SUF ¶ 136.)

It is undisputed that the notches in the Fourth Generation Cassette, like the notches in the Second and Third Generation Cassettes that Plaintiffs do not take issue with, are open to the inside of the cassette, such that the notches are "pass-through" features. (SUF ¶ 143.) Because these notches are pass-through features without any defining structure in the form of an annular wall, these features (even if they could be "clearances") do not "delimit" anything in relation to the cassette or its width or volume. (SUF ¶ 148.) Indeed, as pass-through features any "space" associated with the notches necessarily "passes through" and exists both *inside and outside* the cassette itself. (SUF ¶ 144.) It is impossible for space that exists both inside and outside the cassette to delimit the boundary or volume of the cassette itself—just as it is impossible for a cassette to be delimited at a point where no structural wall exists.

Tellingly, Mr. Jobin's own testimony regarding the alleged "clearance" in the context of the notches establishes the absence of the "delimiting" limitation. In his view, the "clearance" is ███████████████████████████████████████████
██████████████████████████████████████ (SUF ¶ 146; *see also* SUF ¶ 145.)
In other words, ████████████████████████████████████████ (SUF ¶ 146.)

23

But this merely proves that structural *walls* are necessary to define and delimit. And, in the context of the "delimiting" limitation, the cassette itself and its volume must be limited. This requires an annular wall and a "clearance" defined by such wall—not a thin sidewall for a notch and a "pass-through" feature. Mr. Jobin ultimately recognizes this point, as he concedes that ███████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████ (SUF ¶ 147.) Indeed, this "difference" takes the notches outside the claims.

Because the Fourth Generation Cassette does not meet the "radially outward" or "delimiting" limitations of the asserted claims, summary judgment of non-infringement is appropriate, if the patent is not indefinite.

## VI.   PLAINTIFFS ARE NOT ENTITLED TO LOST PROFITS

Munchkin is also entitled to summary judgment on Plaintiffs' claim for lost profits. Edgewell cannot obtain lost profits because it has never been the selling entity with respect to the patented refill cassettes, and because its "inexorable flow" theory is contrary to law and unsupported. Angelcare USA cannot obtain lost profits at least before July 1, 2021, the earliest date on which it both sold the patented refill cassettes and allegedly had capacity to make the claimed lost sales. And none of the Plaintiffs can obtain lost profits, for any period, because Munchkin's Fourth Generation Cassette is an acceptable non-infringing alternative.

### A.   Edgewell cannot rely on an "inexorable flow" theory.

Edgewell claims damages for lost profits on sales of patented refill cassettes through December 18, 2020. (SUF ¶ 161.) But ████████████████████████████████ ████████████████ (SUF ¶ 156.) Rather, ████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████

.”[4] (SUF ¶ 157-158, 165.) EPC, however, ████████████████████████████

████████████. (SUF ¶ 163.); *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1317 (Fed. Cir. 2010). For this reason, Edgewell claims lost profits on the theory that profits from sales of patented refill cassettes through December 18, 2020 "████████████████████████████ (SUF ¶ 161.)

Edgewell's attempt to obtain lost profits based on sales allegedly lost by its subsidiary, EPC, is contrary to Federal Circuit law. "To date, no case decided by the Federal Circuit has allowed a patentee to recover the lost profits of a related company as its own under the inexorable flow theory." *Mars, Inc. v. Trurx LLC*, No. 6:13-cv-00526, 2016 WL 4061981, at *2 (E.D. Tex. Apr. 29, 2016). Moreover, numerous Federal Circuit decisions hold that for a patentee or exclusive licensee to recover lost profits, the lost profits must come from lost sales of a product that entity was selling. The Federal Circuit first faced—and did not adopt—an argument similar to Edgewell's in *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008). There, Mars claimed lost profits from sales lost by its subsidiary, MEI. Mars advanced the inexorable flow theory, asserting that "by virtue of the parent-subsidiary relationship and its consolidated financial statements, all MEI's lost profits were *inherently* lost profits of Mars." 527 F.3d 1359, 1367 (internal quotation omitted). The Federal Circuit disagreed and found that "the facts of this case cannot support recovery under a lost profits theory." *Id.* In doing so, the Federal Circuit principally relied on the undisputed fact that

---

[4] ████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████ (SUF ¶ 159.)

25

1    Mars and MEI had a "traditional royalty-bearing license agreement," whereby MEI paid

2    Mars a royalty "[b]ased on gross sales value" of MEI's products regardless of whether

3    it made any profit on its sales of the products. *Id.* Because "Mars identified no record

4    evidence that it ever received or recognized any form of profit or revenue from MEI

5    apart from these royalty payments," the court concluded that "MEI's profits did not—

6    as Mars argued—flow inexorably to Mars," and Mars could not obtain lost profits. *Id.*

7         EPC's ███████████████████████████████████████████

8    ██████████████████████████████████████████ in *Coin Acceptors*. Both were

9    calculated as a portion of the proceeds on sales made by a separate selling entity, and

10   both were required to be paid whether or not the selling entity made any profit.[5]

11        "[S]ince *Coin Acceptors* was decided, the Federal Circuit has twice indicated that

12   it would be unwilling to allow a patentee to recover the lost profits of a related company

13   as its own under the inexorable flow theory." *Mars, Inc. v. Trurx LLC*, No. 6:13-CV-

14   526, 2016 WL 4034803, at *8 (E.D. Tex. Mar. 14, 2016), *report and recommendation*

15   *adopted*, No. 6:13-CV-526, 2016 WL 4061981 (E.D. Tex. Apr. 29, 2016). In *Spine*

16   *Solutions*, the Federal Circuit held that the district court abused its discretion by

17   allowing the patentee to amend its complaint to add its parent and sister corporations

18   because the evidence was insufficient to establish these entities' standing to sue as

19   exclusive licensees. 620 F.3d 1305, 1317–18. Based on this finding, the Federal Circuit

20

21   ─────────────

22        [5] Similarly, IRC seeks lost profits after December 18, 2020 in the form of
     royalties on Angelcare USA's net sales of Patented Refill Cassettes. (SUF ¶ 187.) These
23   royalties are not recoverable as lost profits, both because ██████████████████████
     ████████████████████████████████████████████████████████████████████████
24   ████████████████████████████████████████████████████████████████████████
     ███████████████████████████ SUF ¶ 186); *see Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778
25   F.3d 1365, 1376 (Fed. Cir. 2015), *vacated on other grounds sub nom. Medtronic*
     *Sofamor Danek USA, Inc. v. NuVasive, Inc.*, 136 S. Ct. 893 (2016); *Coin Acceptors*, 527
26   F.3d at 1367; *see also Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 329 F. Supp.
27   3d 1070, 1104–05 (N.D. Cal. 2018), *aff'd*, 809 F. App'x 965 (Fed. Cir. 2020).

28

─────────────

held that the patentee "is not entitled to recover for any lost profits suffered by [the parent and sister corporations]." *Id.* at 1319. In so holding, the Federal Circuit emphasized that the patentee "does not itself sell any products" and "[t]herefore, is not entitled to any lost profits damages." *Id.*

In *Warsaw*, the patentee sought damages in the form of lost profits based on three different sources of income, two of which—royalty payments and "true-up" payments—came from the patentee's related companies and were based on those related companies' sales. 778 F.3d at 1374. The patentee maintained that it was asking not for its related companies' lost profits but for the royalty and true-up payments that such companies would have remitted to it but for the infringement. *Id.* at 1376. The Federal Circuit agreed that the patentee could not obtain the lost profits of its related companies, emphasizing that "[u]nder our case law a patentee may not claim, as its own damages, the lost profits of a related company." *Id.* at 1375 (citing *Poly-America*, 383 F.3d at 1311 and *Coin Acceptors*, 527 F.3d at 1365). "To be entitled to lost profits," the court reaffirmed, "we have long recognized that the lost profits must come from the lost sales of a product or service the patentee itself was selling."[6] *Id.*

In short, the Federal Circuit has consistently held that a patentee cannot recover lost profits on products it does not sell, and it has never endorsed the inexorable flow theory on which Edgewell relies. Because ███████████████████████████ ████████████████████████████████████████████████ ██████ Edgewell's lost profits claim must fail as a matter of law. (SUF ¶¶ 156-158.)

---

[6] The Federal Circuit in *Spine Solutions* and *Warsaw* relied principally on *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1310–12 (Fed. Cir. 2004), a case in which Poly-America, the patentee, sought to recover lost profits on a product sold by its sister company, Poly-Flex, arguing that "it operates together with [its sister company] as a single economic unit." 383 F.3d at 1310. In refusing to allow Poly-America to recover lost profits, the Federal Circuit emphasized that "[a] patentee needs to have been selling some item, the profits of which have been lost due to infringing sales, in order to claim damages consisting of lost profits." *Id.* at 1311.

27

Even if the Court were to accept Edgewell's inexorable flow theory as viable, however, summary judgment precluding an award of lost profits to Edgewell is still proper because Edgewell is unable to *prove* that profits on sales of patented refill cassettes inexorably flow to it. This is true both because Edgewell's proof is insufficient as a matter of law and because it should be excluded.

Plaintiffs' damages expert, Michael Milani, opines that profits on sales of patented refill cassettes ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████." (SUF ¶ 166.) And Mr. Milani testified that his understanding of ██████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████." (SUF ¶ 167.) Mr. Milani thus confirmed that Edgewell's lost profits theory boils down to an argument that ███████████████████████████████████████████████████████ ████████████████████████████████

But this argument is no different than Mars's reliance on "consolidated financial statements" in *Coin Acceptors*, which the Federal Circuit found to be insufficient to establish the inexorable flow of profits to Mars. *See* 527 F.3d at 1367; *see also Poly-America*, 383 F.3d at 1310–11; *Illinois Tool Works, Inc. v. Seattle Safety, LLC*, No. 2:07-cv-02061, 2010 WL 11523620, at *12-14 (W.D. Wash. Oct. 13, 2010) (granting summary judgment of no lost profits despite "pooled bank accounts"). Consequently, Edgewell cannot establish an inexorable flow of profits from EPC to Edgewell as a matter of law, and summary judgment is still proper.[7]

---

[7] Moreover, there is no basis for Edgewell to claim that profits on sales of patented refill cassettes inexorably flowed to it from December 19, 2019 through

28

Finally, as set forth in Munchkin's forthcoming Motion to Exclude Mr. Milani's report and testimony, Mr. Milani identified no documentary support for his inexorable flow opinions, and instead relied on discussions he had with Edgewell's Rule 30(b)(6) designees, Erik Rahner and Mark Wallis, after they had been deposed. (SUF ¶¶ 168-175.) Mr. Milani's unquestioning reliance on discussions with Mr. Rahner and Mr. Wallis, along with his failure to analyze separate financial statements, makes his testimony unreliable and subject to exclusion under Fed. R. Evid. 702. Without this evidence, Edgewell cannot establish its entitlement to lost profits. Summary judgment is appropriate for this reason, as well.

## B.   Angelcare USA is not entitled to lost profits before July 1, 2021.

Angelcare USA began selling the patented refill cassettes to customers in the United States on December 19, 2020, and therefore cannot receive lost profits before that date pursuant to the authorities discussed in Section VI.A. above.[8] (SUF ¶¶ 177-178.) From December 19, 2020 through June 30, 2021, ████████████████████ █████████████████████████████████████████████████████████████

████████████████████████████

December 18, 2020, because ███████████████████████████████████████ ████████████████████ (SUF ¶ 159.) This is yet another basis for summary judgment.

---

[8] Plaintiffs have been less than forthcoming about whether Angelcare USA is seeking lost profits during the time period before December 19, 2020. Angelcare USA's 30(b)(6) designee testified that "[i]t is my understanding since Angelcare USA assumed the rights of Edgewell, as we discussed earlier, that I'm assuming it's for rights and damages dating back to when Munchkin first introduced its cassette." (SUF ¶ 179.) This, of course is inconsistent with Edgewell's apparent intent to also seek lost profits for the time period prior to December 19, 2020. (SUF ¶¶ 161, 180.) And Plaintiffs' damages expert, Mr. Milani, took no definitive position on the specific time periods for which Edgewell and Angelcare USA are seeking lost profits. (SUF ¶ 181.) Moreover, when Munchkin questioned Angelcare USA's 30(b)(6) designee about any arrangement between Plaintiffs regarding which party is entitled to any damages in this case, counsel for Plaintiffs objected and the witness refused to answer on grounds of privilege. (SUF ¶ 182.) Munchkin is thus left to guess which party is seeking profits for which time period.

29

█████████████████████████████████████████████████

████████████████ SUF ¶ 183.) Accordingly, Angelcare USA cannot prove lost profits before July 1, 2021, as this is the earliest date on which it both sold the patented refill cassettes and allegedly had capacity to make the claimed lost sales. Thus, Munchkin is entitled to summary judgment of no lost profits to Angelcare USA before July 1, 2021.

### C. Plaintiffs are not entitled to lost profits due to the existence of non-infringing alternatives.

As detailed in Sections V.A. and V.B. above, Munchkin is entitled to summary judgment of non-infringement of the '029 Patent as to each of the Accused Cassettes and non-infringement of the '420 Patent as to the Fourth Generation Cassette. There is no dispute as to the acceptability of the Fourth Generation Cassette to Munchkin's refill customers or the availability of this product to Munchkin. (SUF ¶¶ 188-190.) Accordingly, Munchkin is entitled to summary judgment of no lost profits because the Fourth Generation Cassette is an acceptable non-infringing alternative, and therefore Plaintiffs are unable to establish the second factor for lost profits damages under *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).[9] *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1381–82 (Fed. Cir. 2017) (setting aside lost profits award because plaintiff failed to provide evidence that defendant's non-accused product was "not an acceptable or available substitute" to patented product); *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341 (Fed. Cir. 1999) (affirming denial of lost profits due to availability of acceptable non-infringing alternative).

## VII. **CONCLUSION**

For all of the foregoing reasons, Munchkin respectfully requests summary judgment in its favor on all of the grounds set forth herein.

---

[9] Plaintiffs do not seek to establish entitlement to lost profits other than through the *Panduit* framework. (SUF ¶ 141.)

30

1

Dated: May 5, 2022                              LATHROP GPM LLP

2

3                                               By: /s/   Travis M. McCallon

4                                               Attorneys for Defendant
                                                MUNCHKIN, INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

1

## **CERTIFICATE OF SERVICE**

2

3

The undersigned hereby certifies that on May 5, 2022, a true and correct copy of the above and foregoing was filed with the Clerk of Court via the CM/ECF system with service upon the following counsel via the CM/ECF Notice of Electronic Filing:

4

5
          Yuri Mikulka                            yuri.mikulka@alston.com

ALSTON & BIRD LLP

6
333 South Hope Street
Sixteenth Floor

7
Los Angeles, CA 90071

8
Keith E. Broyles                        keith.broyles@alston.com
Wesley C. Achey                      wes.achey@alston.com

9
Pamela H. Councill                 pamela.councill@alson.com
Joshua M. Weeks                  joshua.weeks@alston.com

10
Michael C. Deane                 michael.deane@alston.com
James C. Grant                     jim.grant@alston.com

11
Thomas F. Finch                   thomas.finch@alston.com
ALSTON & BIRD LLP

12
1201 West Peachtree Street NW

13
Atlanta, GA 30309

14
Counsel for Plaintiffs

15

16
                                              /s/ Travis W. McCallon

17
                                        *Attorney for Defendant Munchkin, Inc*.

18

19
48680495v1

20

21

22

23

24

25

26

27

28

32